**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WILLIAM M. LAZORE,**

                              **Plaintiff,**                    **5:07-cv-276**
                                                                **(GLS)**

                    **v.**

**MICHAEL J. ASTRUE,**
Commissioner of Social Security,

                              **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Olinsky, Shurtliff Law Firm                   JAYA SHURTLIFF, ESQ.
300 South State Street, 5th Floor
Syracuse, NY 13202

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN            KAREN G. FISZER
United States Attorney                        Special Assistant U.S. Attorney
445 Broadway
James T. Foley U.S. Courthouse
Albany, NY 12207-2924

MARY ANN SLOAN
Regional Chief Counsel
Social Security Administration
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**District Court Judge**

                    **MEMORANDUM-DECISION AND ORDER**

## I. Introduction

Plaintiff William Lazore challenges the Commissioner of Social Security's denial of disability insurance benefits (DIB) and supplemental security income (SSI), seeking judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). (*See* Compl., Dkt. No. 1.)  After reviewing the administrative record and carefully considering the arguments, the court affirms the Commissioner's decision and dismisses Lazore's complaint.

## II. Background

On April 27 and May 10, 2001, Lazore filed applications for DIB and SSI under the Social Security Act, alleging disability beginning on January 9, 1999, due to degenerative disc disease of the cervical spine, pain in his back and shoulders, and depressive disorders.  (Tr.[1] at 28, 31; *see also* Pl. Br. at 1, Dkt. No. 10.)  After his applications were denied, Lazore requested a hearing before an Administrative Law Judge (ALJ), which was held on August 14, 2002.  (Tr. at 465-93.)  On October 29, 2002, the ALJ issued a decision denying the requested benefits, (Tr. at 28-37), which became the Commissioner's final decision upon the Social Security Administration

---

[1]"(Tr.  )" refers to the page of the administrative transcript in this case.

Appeals Council's denial of review.  (Tr. at 9-11.)

Lazore commenced the present action by filing a complaint on March 15, 2007, seeking review of the Commissioner's determination.  (Dkt. No. 1.)  The Commissioner filed an answer and a certified copy of the administrative transcript.  (Dkt. Nos. 8, 9.)  Each party, seeking judgment on the pleadings, filed a brief.  (Dkt. Nos. 10, 15.)

## III.  **Contentions**

Lazore contends that the Commissioner's decision is not supported by substantial evidence or the appropriate legal standards.  Specifically, Lazore claims that the ALJ: (1) failed to follow the treating physician rule; (2) improperly assessed Lazore's residual functional capacity (RFC) and did not apply the appropriate standard set forth in the Psychiatric Review Technique; and (3) improperly relied on the Medical-Vocational Guidelines. (*See* Pl. Br. at 19-24, Dkt. No. 10.)  The Commissioner counters that substantial evidence supports the ALJ's decision.

## IV.  **Facts**

The evidence in this case is undisputed and the court adopts the parties' factual recitations.  (*See* Pl. Br. at 1-16, Dkt. No. 10; Def. Br. at 2-6, Dkt. No. 15.)

## V.  Standard of Review

The standard for reviewing the Commissioner's final decision under

42 U.S.C. § 405(g) is well established and will not be repeated here.  For a

full discussion of the standard and the five-step process used by the

Commissioner in evaluating whether a claimant is disabled under the Act,

the court refers the parties to its previous opinion in *Christiana v. Comm'r*

*Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y.

Mar. 19, 2008).

## VI.  Discussion

### A.    Treating Physician Rule

Lazore first argues that the ALJ failed to afford appropriate weight to

the opinions of his treating physicians, Drs. Miron Iosilevich and P.

Sebastian Thomas.  (*See* Pl. Br. at 19-21, Dkt. No. 10.)  This argument is

without merit.

Generally, the opinion of a treating physician is given controlling

weight if it is based on well-supported, medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other

substantial evidence in the record.  *See* 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998).

4

An ALJ may not arbitrarily substitute his own judgment for a competent medical opinion. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). Where controlling weight is not given to the treating physician's opinion, the ALJ must assess several factors to determine how much weight to give the opinion, including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination by the treating physician for the conditions in question; (3) the medical evidence and explanations provided in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the qualifications of the treating physician; and (6) other relevant factors tending to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

The "ultimate finding of whether a claimant is disabled and cannot work [is] reserved to the Commissioner." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). "[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions ...." *Snell*, 177 F.3d at 133. Where the evidence of record includes medical source opinions that are inconsistent with other evidence or are internally inconsistent, the ALJ must weigh all of the evidence and

make a disability determination based on the totality of that evidence.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Upon review of the ALJ's decision, the medical evidence, and Lazore's testimony, it is clear that the ALJ accorded appropriate weight to the opinions of Drs. Iosilevich and Thomas.

First, as to Dr. Iosilevich, the ALJ laid out his medical findings, but concluded that "because his opinions are not entirely consistent with the mental status examination findings of record, [Lazore's] reported daily activities[,] and the other substantial evidence, they are given limited weight."  (Tr. at 33-34 (citation omitted).)  This conclusion is amply supported by the overall record.

In evaluating Lazore's mental ability to do work-related activities on April 19, 2002, Dr. Iosilevich found that Lazore was unable to maintain regular attendance and punctuality, to remain attentive for two-hour segments of time, to work in coordination with or in proximity to others without being distracted, or to complete a normal workday and perform at a consistent pace without interruptions and rest periods.  (Tr. at 333-34.)  Dr. Iosilevich additionally rated as "poor or none" Lazore's ability to understand, remember, and carry out detailed instructions, to set realistic

goals or make independent plans, and to deal with stress in semiskilled or skilled work.  (Tr. at 334.)  Still, Dr. Iosilevich found that Lazore remained able to remember, understand, carry out, and sustain simple procedures and instructions; to request and accept instructions; to respond appropriately to supervisory criticism and changes in the work routine; to get along with coworkers and peers without distracting them; to deal with normal work stress; to maintain awareness of normal hazards and precautions; and to travel in unfamiliar places and use public transportation.  (Tr. at 333-34.)  To explain his findings, Dr. Iosilevich opined that Lazore's "concentration and focus remain[ed] impaired at many times during the week," that his "depression, poor concentration, [and] high level of anxiety would impede [his] ability to do semi-skilled and skilled work," and that, in the workplace, Lazore "would most likely attempt to avoid others and may very well misinterpret intentions of others."  (*Id.*)

Dr. Kristen Barry, who performed a psychiatric examination of Lazore on June 21, 2001, found Lazore "able to perform simple tasks ... [and] follow and understand simple directions and instructions."  (Tr. at 262.)  Dr. Barry observed that Lazore's manner of relating and social skills were fair and that he presented a neat and clean appearance, had normal gait and

posture, maintained appropriate eye contact, spoke fluently and clearly, evidenced adequate expressive and receptive language skills, had clear sensorium, was oriented to person, place, and time, had coherent and goal-directed thought processes, and had a mood that appeared neutral but not anxious or depressed. (Tr. at 261-62.) And while Dr. Barry estimated Lazore's intellectual functioning to be in the low-average range, insight to be limited, judgment to be poor, and affect to be somewhat restricted, she still found him "able to maintain his attention and concentration fairly well," with recent and remote memory skills intact. (Tr. at 262.) Dr. Barry also noted that Lazore attributed his inability to work to his neck and spine problems and that he had a "significant alcohol problem." (*Id.*)

Dr. Carlos Gieseken, a State agency psychiatric consultant, reviewed Lazore's medical records on July 24, 2001, and concluded that Lazore had moderate limitations in his ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to operate within a schedule with regular and punctual attendance, to complete a normal workday and workweek, to accept instructions and respond appropriately to supervisory criticism, to get along with coworkers

8

and peers and maintain socially appropriate behavior, to work in coordination with or proximity to others without being distracted, and to set realistic goals or independently make plans. (Tr. at 272-73.) Dr. Gieseken otherwise found no significant limitations in Lazore's ability to remember locations and work procedures; to understand, remember, and carry out simple and short instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to interact appropriately with the general public; to ask simple questions and request assistance; to respond appropriately to work-setting changes; and to be aware of normal hazards and take appropriate precautions. (*Id.*) Accordingly, Dr. Gieseken opined that Lazore was capable of performing unskilled work. (Tr. at 274.)

In light of this evidence, and contrary to Lazore's contentions, Dr. Iosilevich's opinions in isolation do not conclusively establish that Lazore is incapable of meeting the mental demands of unskilled work. Rather, Dr. Iosilevich's findings are generally consistent with the ALJ's findings, and, as the Commissioner highlights, Dr. Iosilevich's specific remarks were at times conditional or hypothetical. Moreover, when considering Dr. Iosilevich's opinions with the relevant remainder of the record, the extent to

which the ALJ relied on Dr. Iosilevich's opinions was appropriate and supported by substantial evidence.

Second, as to Dr. Thomas, a physician who treated Lazore's pain, the ALJ summarized his medical opinions and found them "significant because they are fairly consistent with the overall record, including the clinical findings and the claimant's reported activities." (Tr. at 33-34.)  On August 22, 2002, Dr. Thomas evaluated Lazore's physical ability to do work-related activities. (Tr. at 423-26.)  Dr. Thomas opined that Lazore could occasionally lift less than ten pounds; that his ability to push and pull with his upper extremities was limited; that he could never crouch, crawl, or stoop; that he had limited ability to reach in all directions; and that his gross and fine manipulative functions were limited. (*Id.*)  Dr. Thomas also listed Lazore's environmental limitations to include only temperature extremes and vibration. (Tr. at 426.)  On the other hand, Dr. Thomas found that Lazore had no standing, walking, or sitting limitations and that he could occasionally climb, balance, kneel, reach in all directions, and perform gross and fine manipulation. (*Id.*)

The ALJ declined to give Dr. Thomas's opinion controlling weight because it was at times inconsistent with other evidence on record,

including Lazore's testimony and written statements.  (Tr. at 34.)

Dr. Chandra Singh examined Lazore on February 27, 1999, regarding his neck and back pain.  (Tr. at 203-206.)  Dr. Singh found no limitations in Lazore's fine motion activity and his range of motion and strength in his upper and lower extremities.  (Tr. at 204-05.)  But having observed Lazore experience some pain and spasm resulting from cervical and lumbosacral motions, Dr. Singh diagnosed Lazore with neck and lower back pain due to either degenerative joint and disk disease or muscular pain. (Tr. at 205.)  Accordingly, Dr. Singh referred Lazore to an orthopedic doctor.  (Tr. at 203.)  Still, as to work-related activities, Dr. Singh found Lazore "mildly limited in the duration of time he can sit and stand, moderately limited in his ability to ambulate, lift, and carry," and that he "should be able to recuperate ... in three to six months."  (*Id.*)

A series of subsequent X-rays of Lazore's cervical spine revealed some disc space narrowing, no misalignment, and minimal degenerative changes.  (Tr. at 207-11, 214, 216, 219, 222.)  The same X-rays showed no signs of degeneration, disc space narrowing, or any other pathology regarding Lazore's thoracic and lumbar spine.  (*Id.*)

Over the course of the next year and a half, Lazore received

11

treatment at St. Joseph's Hospital Orthopedic Clinic, Syracuse, New York. (Tr. 210-23.)  Drs. Newton Holobinko, Mark Altman, Todd Herrenbruck, Seth Greenky, Matthew Riedesel, and Bradley Gereer examined Lazore during this period.  (*Id.*)  In sum, these physicians found that Lazore suffered from some pain and tenderness in his neck and thoracolumbar spine, but otherwise was fully able to bend forward and had full strength, normal range of motion, and normal sensory in his upper and lower extremities.  (*Id.*)  Pursuant to their findings, these doctors recommended regular physical therapy, including stretching and strengthening, and prescribed Relafen for pain.  (Tr. at 211, 213, 215-16, 220.)  While Lazore did not begin his physical therapy until May 1999, Dr. Greenky found in June 1999 that Lazore was "doing much better" and could "return to work without restriction."  (Tr. at 219; *see also* Dr. Riedesel Notes, Tr. at 220 (discussing measures Lazore can take at work to decrease his pain and headaches without suggesting that Lazore could not return to work).)  Additionally, Dr. Herrenbruck noted in May 1999 that Lazore reported having no symptoms during a long vacation in the Bahamas, and only began to experience pain upon his return home.  (Tr. at 216; *see also* Dr. Mark Barasz Emergency Room Note, Tr. at 228 (noting in April 1999 that

Lazore felt well while in Florida "until he drove all the way home and when he returned").)  On September 22, 2000, Lazore checked into St. Joseph's Emergency Room, and Dr. Joseph Markham discharged Lazore, finding him to be "a well patient with no acute distress ... [and] some mild tenderness to the cervical spine and trapezius muscles."  (Tr. at 245.)  Ultimately, on October 23, 2000, Dr. Gereer referred Lazore back to his primary care physician since Lazore's "headache appear[ed] to be his major complaint" such that "[n]o further work up of his [cervical] spine [was] necessary at th[at] time."  (Tr. at 222.)

Lazore thereafter met with orthopedist Dr. Kalyani Ganesh on June 11, 2001.  (Tr. at 254-57.)  Dr. Ganesh generally found that Lazore suffered from chronic neck and lower back pain, had "minimal-to-mild limitation to lifting, carrying, pushing, and pulling because of pain," but had no gross physical limitations with sitting, standing, walking, climbing, or bending.  (Tr. at 256.)  Dr. Ganesh further observed that Lazore had normal gait, full range of motion and full strength in his upper and lower extremities, and full range of motion in his cervical, thoracic, and lumbar spine, with no apparent spinal or paraspinal tenderness or spasm.  (*Id.*)

Equally important, and in addition to statements made to his treating

13

physicians about his daily activities, (Tr. at 204, 255), Lazore himself reported on June 13, 2001, that he could stand for up to one hour, sit for up to seven hours, lift up to forty pounds, and bend and squat with some pain. (Tr. at 156.)

When considering Lazore's own testimony and submissions, (Tr. 476-77, 480-82), in conjunction with all of the record medical opinions—including Drs. Sury Putcha and B.W. Gajwani, two State agency medical consultants who opined that Lazore could perform at an exertional level that was more demanding than unskilled light work, (Tr. at 234-41)—the ALJ's decision to give "significant" rather than "controlling" weight to Dr. Thomas's opinion was both supported by substantial evidence and consistent with the regulatory requirements.

## B.   Residual Functional Capacity

While it is undisputed that the ALJ correctly determined that Lazore could not perform his past relevant work, Lazore argues that the ALJ improperly assessed his physical and mental limitations and therefore his RFC determination is not supported by substantial evidence.  (*See* Pl. Br. at 21-23, Dkt. No. 10.)  The court disagrees.

The Commissioner defines RFC as a claimant's "maximum remaining

14

ability to do sustained work activities in an ordinary work setting on a regular and continuing basis ... 8 hours a day, for 5 days a week, or [on] an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996) (emphasis omitted); *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  Accordingly, in assessing a claimant's RFC, the ALJ "must include a discussion of the individual's abilities on that basis."  SSR 96-8p, 1996 WL 374184, at *2.  The ALJ must consider all the relevant evidence in the record, including the claimant's physical abilities, mental abilities, and symptoms, pain, and other limitations which could interfere with work activities on a regular and continuing basis.  *See generally* 20 C.F.R. § 404.1545; *see also Verginio v. Apfel*, No. 97-CV-456, 1998 WL 743706, at *3 (N.D.N.Y. Oct. 23, 1998).

In making an RFC assessment, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  SSR 96-8p, 1996 WL 374184, at *1, 3; *see also* 20 C.F.R. §§ 404.1545(b)-(d), 416.945(b)-(d).  The ALJ must establish "by substantial evidence each of the criteria of the physical requirements in the regulations."  *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990) (citation omitted).  The ALJ must specify

which functions the claimant is able to perform and may not "simply mak[e] conclusory statements regarding [the claimant's] capacities." *Id.*

In addition to considering physical limitations, the ALJ must also evaluate the severity of any mental impairments the claimant may have.  In doing so, the ALJ must first determine whether the claimant has a "medically determinable mental impairment."  20 C.F.R. § 404.1520a(b)(1).  If the claimant has such an impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" in the context of "four broad functional areas": (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  *Id.* at § 404.1520a(b)(2), (c)(3); *see also Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008).  The first three areas are rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme."  20 C.F.R. § 404.1520a(c)(4).  "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the [ALJ] generally will conclude that the claimant's mental impairment is not 'severe ....'"  *Kohler*, 546 F.3d at 266 (citation omitted).  However, if the claimant's mental impairment is deemed severe, the ALJ must determine whether the impairment meets or equals the

16

severity of a mental disorder listed in § 12.04 of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520a(d)(2).

Only after assessing the claimant's functional limitations and abilities may the ALJ categorize the RFC into exertional levels of work, i.e., "sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1.

Here, after finding that Lazore's physical and mental impairments "cause significant limitation of function" but are "not severe enough to meet or medically equal one of the impairments listed," the ALJ outlined at length the medical evidence relevant to making an RFC assessment and concluded that "based on his daily activities, the clinical findings[,] and the probative medical opinions, ... [Lazore] retains the [RFC] to lift, carry, push and pull 20 pounds, stand and walk six hours ... and sit six hours in an eight-hour day." (Tr. at 31, 34). The ALJ further determined that, "despite his mental impairments, [Lazore] has the ability to understand, carry out[,] and remember simple instructions, respond appropriately to supervision, co-workers, and the usual work situations, to deal with changes in a routine work setting[,] and maintain attention and concentration." (*Id.*) The ALJ

17

additionally discounted Lazore's allegations regarding the intensity,

frequency, and duration of his symptoms based on Lazore's "intermittent

treatment and his failure to follow through with medical recommendations,

the positive effect of treatment when followed, the minimal positive physical

and mental status examination findings, [Lazore's] conflicting statements

regarding his alcohol and drug use and his physical limitations, [and] the

extent of his daily activities." (*Id.*)  Consequently, the ALJ determined that

Lazore retained the RFC to perform a full range of unskilled light work.  (Tr.

at 36.)

Based on the medical and testimonial evidence, which the court has

discussed at length, and in light of the basis proffered for his decision, the

ALJ acted in compliance with the regulations in assessing Lazore's RFC.

While the ALJ did not document his findings specific to the four functional

areas, *see Kohler*, 546 F.3d at 267, the court is satisfied that such an

omission was harmless.  The ALJ did evaluate the nature and extent of

Lazore's mental impairments and assessed in detail Lazore's daily

activities, his ability to function socially and in a workplace environment,

and his ability to maintain attention and concentration.[2]  (Tr. at 34.)  The

ALJ resultingly found Lazore's limitations in these areas negligible and of

no meaningful consequence.  Therefore, despite the ALJ's technical failure

to rate the functional areas pursuant to the § 404.1520a

requirements—which would normally warrant remand, *see, e.g.*, *Moore v.*

*Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005)—the court concludes that

the ALJ adequately developed the record and logged his findings, and that

substantial evidence supports his RFC assessment.

## C.    Medical-Vocational Guidelines

Lastly, Lazore argues that the ALJ's reliance on the Medical-

Vocational Guidelines to direct a finding of "not disabled" was erroneous.

(*See* Pl. Br. at 23-24, Dkt. No. 10.)  The court rejects this objection.

Where a claimant suffers only from exertional impairments, the ALJ

may satisfy the step-five burden by relying on the Medical-Vocational

Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  *See Pratts v.*

*Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996).  However, as a general rule, "if a

claimant suffers from additional 'nonexertional' impairments, the

––––––––––––––––––––

[2]The record contains no evidence suggesting that Lazore experienced any episodes of decompensation.

19

[Guidelines] may not be controlling ... [and] the [G]uidelines cannot provide the exclusive framework for making a disability determination." *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986).  Nonetheless, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert [or] preclude reliance on the [G]uidelines." *Id.* at 603.  For instance, where "the claimant's nonexertional impairments do not prevent [him] from performing the full range of work contemplated by the Guidelines, the ALJ may rely on the Guidelines in directing a determination of 'not disabled' without resort to vocational expert testimony." *Tucker v. Heckler*, 776 F.2d 793, 796 (8th Cir. 1985); *see also Bapp*, 802 F.2d at 606 (citing *Tucker* with approval).  On the other hand, "if a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations then the [Guidelines] obviously will not accurately determine disability status." *Bapp*, 802 F.2d at 606 (internal quotation marks and citation omitted).  Ultimately, the appropriateness of an ALJ's exclusive reliance on the Guidelines "must be determined on a case-by-case basis." *Id.* at 605.

Here, the ALJ made the principal finding that Lazore had the RFC to perform "the full range of unskilled light work," (Tr. at 36), a finding that the

court has already credited as supported by substantial evidence.  The ALJ further found that Lazore's mental impairments did not materially restrict his ability to engage in unskilled light work.  And accordingly, based on Lazore's RFC, age, ninth-grade education, and prior work experience, the ALJ relied on §§ 202.17, 202.18, and 202.19 of the Guidelines to direct a conclusion of "not disabled."  (Tr. at 35-37.)

While Lazore accurately asserts that an inability to stoop constitutes a nonexertional limitation that can significantly narrow the available occupational base, (*see* Pl. Br. at 23, Dkt. No. 10 (citing Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *8 (S.S.A. 1996)), such an assertion is not enough to render the ALJ's reliance on the Guidelines erroneous, particularly since the record contains substantial evidence that contradicts Dr. Thomas's opinion and establishes that Lazore is capable of stooping at least occasionally.  *Cf.* SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983) ("The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping.").

Therefore, because the ALJ's decision to rely on the Medical-Vocational Guidelines to direct a finding of "not disabled" was both proper under the regulations and supported by substantial evidence, the court

21

affirms that finding and rejects Lazore's request for remand.

**D.**     **Remaining Findings**

After careful review of the record, the court finds that the remainder of the ALJ's decision is supported by substantial evidence.

## VII.   Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Lazore's complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 30, 2010
Albany, New York

United States District Court Judge